UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TRUSTIVO, LLC, ) | |
| ) | |
| PLAINTIFF ) | |
| ) | |
| v. ) | |
| ) DOCKET NO. 1:16-CV-11104-RGS | |
| MONEY MANAGEMENT ) | |
| INTERNATIONAL, INC. ) | |
| ) | |
| DEFENDANT ) | |

## MEMORANDUM OF LAW IN SUPPORT PLAINTIFF TRUSTIVO, LLC'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

### Introduction

The plaintiff, TRUSTIVO LLC, is a Massachusetts based early-stage company engaged in the business of providing comprehensive "**Workplace Financial Wellness Services**" for the benefit of individuals and their families through partnerships with *employers* nationwide. TRUSTIVO's Workplace Financial Wellness services fall into two broad categories:

  a.    Financial "Planning" including Investments, Retirement, College;

  b.    Financial "Counseling" including Debt, Budget and Money Counseling.

TRUSTIVO's services are provided to employees through three main engagement platforms or "delivery methods": (i) telephonic, (ii) online, and (iii) in-person. TRUSTIVO does not market its services to these individuals directly, but offers its

comprehensive financial wellness services through *employers* and other business partners.

The Defendant, Money Management International, Inc. ("MMI") MMI is the largest nonprofit, full-service credit counseling agency in the United States. Its stated mission is to provide "Financial Education" services directly to individual consumers.

Because TRUSTIVO does not itself operate a telephonic contact center or "call center," and in order to expand providing TRUSTIVO's financial wellness services to include financial counseling services in, 2014, TRUSTIVO entered into a written agreement with MMI to provide call center and other services discussed below.

Both before entering into the contract, and in the contract itself, MMI represented to TRUSTIVO that MMI's services were consistent with its stated "mission" and limited to providing "Financial Education" to individual consumers. MMI did not any time disclose to TRUSTIVO that it competed with TRUSTIVO, or that it intended to compete with TRUSTIVO during the term of the Agreement, by offering comprehensive financial wellness services to employers.

The Agreement between the parties contains a broad provision prohibiting MMI from directly or indirectly competing with TRUSTIVO during the term of the Agreement and for one year after.

The Agreement, further, provides that it renews automatically on an annual basis unless terminated more than (90) days before the renewal date. The Agreement gives MMI the right to terminate the "[i]n the event MMI is unable to fully recover its costs under this Agreement, including general and administrative expenses[,]" subject to

TRUSTIVO's right to cure the default within 15 days after notice of the alleged default.

TRUSTIVO believes that MMI has materially breached the Agreement in two material respects:  (1) by improperly competing with TRUSTIVO during the term of the Agreement, beginning before the Agreement was executed or at least beginning sometime in 2015, through its "Financial Solutions Program," which MMI itself describes as a "comprehensive" "***employer-sponsored*** wellness program" and (b) improperly purporting to terminate the Agreement based on the false claim that it was unable to recover its costs and that TRUSTIVO was therefore in default, while refusing in good faith to provide any substantiation of claimed default, and instead providing incomplete, inaccurate, and false information to justify its bad faith efforts to terminate the Agreement. MMI's actions have caused, and will cause, TRUSTIVO to suffer substantial damages to its reputation, substantial monetary damages of an uncertain and potentially difficult to ascertain amount, and irreparable harm.

TRUSTIVO seeks injunctive relief and has asserted claims for breach of contract (Count 1), Breach of the Covenant of Good Faith and Fair Dealing implied in every contract under Massachusetts law (Count 2), Misrepresentation/Fraud (Count 2), and violation of M. G. L. c. 93A (Count 4). TRUSTIVO also seeks a stay of this action following a hearing on TRUSTIVO's request for injunctive relief.[1]

---

[1] The Agreement contains an arbitration clause specifying that "in the event of a dispute MMI and TRUSTIVO agree to binding arbitration in Boston … in accordance with JAMS Rules..." TRUSTIVO intends to submit this matter to arbitration, but first seeks injunction relief in aid of the arbitration in order to preserve the status quo and prevent further irreparable harm to TRUSTIVO should MMI continue to improperly compete with TRUSTIVO or should MMI improperly terminate the Agreement on June 15, 2016.

Factual Background[2]

The parties

The Plaintiff TRUSTIVO, LLC ("TRUSTIVO") is a Delaware company with a principal place of business in Cambridge, Massachusetts.  (¶1). The Defendant, Money Management International ("MMI") is a Texas nonprofit corporation. According its website, further, MMI provides services 24/7 by phone and internet in every state in the nation and in-person sessions in select location. (¶2)

*TRUSTIVO's Business*

TRUSTIVO is a Massachusetts based early-stage company engaged in the business of providing comprehensive workplace financial wellness services for the benefit of individuals and their families through national partnerships with employers. 3 TRUSTIVO's Workplace Financial Wellness services fall into two broad categories:

✓      Financial "Planning", which includes Retirement Planning, IRA roll-overs, College Funding, Investments, Taxes, Estate and Wills;

✓      Financial "Counseling", which includes Budget and Money Counseling, Debt Management, Credit Report Review Student Loan Counseling, Foreclosure Prevention, Reverse Mortgage Counseling, Pre-Purchasing Housing Counseling, Bankruptcy Counseling, Financial Hardships. 8TRUSTIVO's services are provided to individuals through three main engagement platforms or "delivery methods": telephonic, online, and in-person.  TRUSTIVO does not market its services to employees directly, but offers its services through ***employers*** and business partners.

(¶9)

---

[2] All parenthetical references herein are to the Verified Complaint

*MMI's Business*

MMI is a nonprofit tax exempt 501(c)(3) organization and one of the largest full-service credit counseling agency in the United States. Its mission is "improving lives through financial education". MMI operates five call centers for consumers which as of today are integrated with TRUSTIVO's business through the Agreement discussed below. (¶10)

MMI receives significant annual grants and contributions from private and public organizations such as: American Express, Bank of America, Citigroup, Discover JP Morgan Chase, Making Home Affordable (MHA), Kohl's, Target, United Way US Department of Housing and Urban Development, USAA and Wells Fargo, just to name a few. Upon information and belief, MMIs' 2012 revenues were $86.7 million USD in 2012. (https://en.wikipedia.org/wiki/Money_Management_International) (¶10)

*The Parties' contract*

Because TRUSTIVO itself, does not operate a telephonic contact center or "call center", and in order to expand providing TRUSTIVO's financial wellness services to include financial counseling services, or about July 1, 2014, TRUSTIVO entered into a written agreement with MMI to provide specific services discussed below. (¶12, Ex. 1)

Before entering into the Agreement, TRUSTIVO and MMI, discussed the respective services offered by each party. At that time, MMI represented to TRUSTIVO that MMI's core "mission" was to "improve lives through financial education" to customers." In fact, during the negotiations, MMI provided TRUSTIVO a Microsoft PowerPoint brochure (Ex. 2) which extensively describes MMI's services, and specifically identifies the services offered to as Financial Education Services, Debt and

Budget counseling, Debt Management, Housing Counseling, Bankruptcy counseling and Education, Credit Report review,   Student loan counseling, and representative payee services.  (*Id*. at 9). The brochure, further, expressly describes these services as being provided to ***individual consumers***.  (¶13, Ex. 2 at 5, 10-11)

Consistent with their prior discussions, in the contract, drafted entirely by MMI, the parties described the purpose and context of their agreement, and set forth a number of specific recitals to describe their respective services and the parties' respective missions and goals. The parties stated that TRUSTIVO's "mission is to provide employees and their families with best of class financial wellness resources, anchored by the nation's largest independent provider network of financial planners (1st Recital Clause), while MMI's "mission" is to improve lives through financial education[.]" (4th Recital Clause.]   MMI also explicitly stated that it desired "to participate in TRUSTIVO's employee financial wellness national platform and programs by offering its Education Services and Triage Services" to TRUSTIVO members.  (5th Recital.] MMI further represented to TRUSTIVO and agreed in §10.4 of the Agreement that it "shall work with TRUSTIVO to integrate [MMI's] Education Services into TRUSTIVO's existing sweet of financial wellness services[.]"(¶14)

MMI did not inform TRUSTIVO that MMI itself provided or marketed any comprehensive financial wellness services, whether to individuals directly or to employers, or that it intended to compete with TRUSTIVO in the future. (¶15)

The contract further obligates MMI to provide various services to TRUSTIVO members through MMI's telephonic call center (§7), including the

following:   Credit Counseling (§2); Debt Management Plans  or "DMP's" (§4); "Education Services," including credit counseling, debt management, housing counseling, bankruptcy counseling and other financial services (§4 and 2nd Recital Clause);  and "Triage Services," which involve assisting TRUSTIVO members who contacted the call center determining which financial path they should pursue, and ensure such individuals' information is provided to the appropriate financial wellness resource, *e.g.*, telephonic counseling provided through MMI or referral to TRUSTIVO's network of financial advisors. (§3 and 3rd Recital Clause).   The contract also requires MMI to cooperate with TRUSTIVO in developing a marketing plan for the TRUSTIVO financial wellness service. (§11).  (¶16)

Notably, the Agreement did not provide for any direct compensation to be paid by TRUSTIVO to MMI. Rather, apart from the revenue that MMI derived from its annual funding sources as a non-profit, the only compensation that MMI was to receive pursuant to the Agreement was payment by a TRUSTIVO member for any Debt Management Plan provided by MMI to that member.  (See §8.1)  (¶17)

Section 16.3 of the Agreement, drafted and proposed by MMI (¶18) , also contains an explicit provision prohibiting MMI from directly or indirectly competing with TRUSTIVO during the term of the Agreement and for one year after. It states:

During the term of this Agreement  and for a period  of twelve (12) months thereafter MMI agrees to not ***directly or indirectly*** solicit, ***compete*** or induce Qualified Members, EAPs or Employers to terminate, reduce, divert, entice, take away or attempt to divert or take away or otherwise change their current business relationships with TRUSTIVO. Both parties also agree to not solicit the other's employees or contractors as of the date of this Agreement for twelve (12) after the termination of this Agreement. Notwithstanding, MMI may conduct outreach and otherwise market ***to consumers***, as is its current standard practice as of the date of this Agreement,  without violating this  Section  16.2 or 16.3.

(Emphasis added.)( (¶18)

The Agreement further specified in §18.1 that it would be effective as of July 1, 2014 and remain in effect for a period of twelve (12) months, until June 30, 2015, unless sooner terminated" in accordance with other provisions of §18, and that "after the initial term and subsequent terms, [the] Agreement shall automatically renew for another period of twelve (12) months unless notice to terminate is provided ninety (90) days before the termination date." (¶19)

Section 18.2 of the Agreement then identifies various grounds for termination of the Agreement by either party for cause. In particular, §18.2.5 provides that MMI may terminate the Agreement "[i]n the event MMI is unable to fully recover its costs under this Agreement, including general and administrative expenses."   Section 18.4, however, provides that "[t]he party receiving the notice of termination for breach of Section [18.2.5] shall have fifteen (15) business days to cure the default to the satisfaction of the party giving the notice, prior to the effective date of the termination of the Agreement." (¶20)

By July 1, 2015, the first anniversary of the Agreement, neither party had terminated the Agreement, and it therefore automatically renewed pursuant to §18.1.  Further, and as alleged in detail below, TRUSTIVO does not believe that MMI has properly or validly terminated the Agreement, such that it will automatically renew on July 1, 2016. (¶21)

At the time of the commencement of the Agreement and at the time of the automatic renewal on July 1, 2015, TRUSTIVO was not aware of and had no

reason to believe that MMI had breached or intended to breach any of its obligations under the Agreement, including the non-compete provision. (¶22)

After the Agreement was executed, in the good faith belief that MMI's mission and services was limited to providing financial education to individual consumers, and that MMI did not compete and did not intend to complete with TRUSTIVO in providing comprehensive financial wellness services to consumers or through employers, TRUSTIVO provided extensive training to MMI's employees on TRUSTIVO's financial wellness services. Among the confidential items discussed TRUSTIVO provided MMI with a broad view of the financial wellness marketplace, its services, and finally processes and procedures for integrating MMI's education services into the TRUSTIVO financial wellness platform. (¶23)

### MMI's Breach of Contract

MMI has breached the Agreement in at least two material respects, first by improperly competing with TRUSTIVO in violation of §16.3 of the Agreement, and second, by repeatedly and improperly threatening to terminate the Agreement based on contrived defaults by TRUSTIVO, and using those threats to obtain, or attempt to obtain, advantages under the Agreement to which MMI was not entitled, and by failing to give TRUSTIVO a meaningful opportunity to cure any alleged default. 25

### *MMI's improper efforts to compete with TRUSTIVO*

As set forth above, at the time of the execution of the Agreement, MMI's "mission" was limited to "improv[ing] lives through financial education[.]" (4th Recital Clause.]  Moreover, MMI also explicitly stated that it desired "to participate

in *TRUSTIVO's* employee financial wellness national platform."    At that time, MMI's mission and service, directed solely at providing education services to individual consumers, *i.e.*, **employees**, did not compete with TRUSTIVO.  (¶26)

MMI's senior executive team even described (in writing) the relationship with TRUSTIVO as a "***partnership***". Thus, in good faith, on June 19, 2014, TRUSTIVO travelled to MMI's offices in Texas and provided MMI staff with TRUSTIVO training on the TRUSTIVO Financial Wellness services as well as explicitly marked 20 page "proprietary and confidential" brochure concerning those financial wellness services.  In connection with the joint marketing plan developed between the parties pursuant to §11 of the Agreement, further, Trustivo provided confidential marketing and promotional strategies such as program features, pricing, and sales channels. (¶27)

However, sometime in 2015, during the term of the Agreement, MMI apparently dramatically expanded the scope and nature of its stated mission and services and began directly and indirectly competing with TRUSTIVO by offering what MMI claims are ***comprehensive financial wellness services*** to ***employers through its newly-developed*** Financial Solutions Program (FSP), an ***employer-sponsored*** wellness program. (¶28) As stated in MMI's 2015 Annual Report, (Ex. 3) (also                                     available                                     at *http://www.moneymanagement.org/~/media/Files/MMI/About/Contact%20Us/Annual%20Reports/2015%20Annual%20ReportFinal.pdf*), during 2015, MMI saw an opportunity to "expand [its] education and counseling programs beyond recovery based solutions to service more focused on overall financial wellness." (Ex. 3 at 2).

The annual report further stated that "[a]s part of [MMIs] growth objective, we launched a significant effort to expand our Financial Solutions Program (FSP), an **employer-sponsored** wellness program." (Ex. 3 at 9). (Emphasis added.) (¶29)

On its website, MMI describes the newly-launched Financial Solutions Program as a "comprehensive financial wellness program designed by [MMI] to help secure your [*i.e.*, the *employers*' and other organizations'] bottom line by addressing the financial issues of your employees, customers, and members." (Ex. 4)(available at *http://www.moneymanagement.org/About-Us/Partners/Financial-Solutions-Program/Financial-Solutions-FAQ.aspx)* (¶30)

### *MMI's improper efforts to terminate the Agreement*

MMI has also breached the Agreement by attempting to terminate it without proper cause and in bad faith. On December 21, 2015, while MMI was apparently improperly competing with TRUSTIVO, MMI's Chief Executive Officer (CEO), Ivan Hand, provided TRUSTIVO written correspondence purporting to terminate the Agreement pursuant §18.2.5 based on MMI's alleged inability to recover its program costs. (Ex. 5) The correspondence stated: "Unfortunately, MMI is no longer able to assist TRUSTIVO under the [Agreement] because MMI has never been able to recover its costs....I respectfully request that the Agreement be terminated for cause in accordance with section 18.2.5." The correspondence then concluded by stating that MMI intended to cooperate with TRUSTIVO in winding down MMI's services and thanking TRUSTIVO for the opportunity to serve its clients. Though couched in polite terms, MMI's correspondence made it clear that it intended to terminate the Agreement. (¶31)

Despite that §18.4 of the Agreement affords a 15-day opportunity to cure, MMI's December 21, 2015 correspondence made no mention of that right, and, even more significantly, provided no detail whatsoever as to MMI's revenues or its expenses so that TRUSTIVO could evaluate whether MMI's claim that it could not recover costs was made in good faith, and if so, whether to exercise TRUSTIVO's right to cure. (¶32)

After receiving the December 21, 2016 correspondence, TRUSTIVO's CEO, Rad H. Pasovschi, contacted Mr. Hand who directly referred him to MMI's Chief Operating Officer (COO), Tony Scataglia. (¶33)

On December 22, 2015, Mr. Pasovschi spoke with Mr. Scataglia on the phone. Mr. Pasovschi explained to Mr. Scataglia that due TRUSTIVO's upcoming (February 1, 2016) large-scale national rollout with approximately 26,000 employers and 6 million employees, TRUSTIVO wanted to cure the alleged breach per s §18.4 of the Agreement and requested that MMI identify the revenues and expenses to substantiate the default. (¶34)

On December 22, 2015, Mr. Scataglia followed up on the telephone conversation with an email to Mr. Pasovschi. In the December 22 email (Ex. 5), Mr. Scataglia stated, among other things, that in order for MMI to continue providing the services through March 31, 2016, TRUSTIVO would have to "pay $5 per call directed to MMI for Triage Services." Despite that TRUSTIVO had contractual right to cure, Mr. Scataglia's December 22 email did not explicitly inform Mr. Pasovschi what amounts would be necessary to cure the alleged default. Instead, Mr. Scataglia explicitly stated "this payment per call is not enough funding to cure the 18.2.5 termination provision." (¶35)

On December 24, 2015, Scataglia emailed Mr. Pasovschi and stated that "[a]s for the termination notice previously provided, MMI is willing to provide TRUSTIVO until January 15 to cure the cost recovery issue related to 18.2.5 or reach another agreement with TRUSTIVO in writing.  We can discuss during the first week in January." (Ex. 6) (¶36)

On December 28, 2015, Mr. Pasovschi emailed Mr. Hand concerning the purported December 21 termination. Because of the potential catastrophic impact to TRUSTIVO of the threatened termination of the Agreement and Mr. Pasovschi's concerns that because MMI had not provided any detailed backup of the alleged cost-related default, TRUSTIVO might face "serial" claims by MMI of a cost-related default, Mr. Pasovschi advised Mr. Hand:

> Since we have significant business relationships currently engaged with the telephonic financial counseling services that TRUSTIVO provides through MMI, per section 18.4 TRUSTIVO would like to continue with the Agreement and cure the default. Subsequent to this cure and going forward we would like to better understand all the elements of section 18.2.5 (of significance to MMI) so as to not find ourselves in the same position in the future.

(¶37)

Later on December 28, Mr. Hand responded to Mr. Pasovschi concerning the parties' efforts to reach a "resolution" of the purported December 21 termination.  Among other things, Mr. Hand stated to Mr. Pasovschi via email: "I further understand that a part of that conversation is MMI communicating its funding needs under section 18.2.5. Like you, I certainly hope we can cure the default and begin a long term mutually beneficial relationship." (¶38)

Still later on December 28, Mr. Pasovschi responded to Mr. Hand by email, in which he stated:

> To date TRUSTIVO has not received any costs details relating to section 18.2.5 termination and section 18.4 cure provision: i.e. MMI costs (fixed and/or variable) and revenues derived from the program since the launch in July 2014. This aspect is important so that TRUSTIVO can develop an understanding of the MMI's on-going program costs and its subsequent funding needs. Also to ensure that going forward, we have the mutual beneficial working relationship which we both seek.

(¶39)

On January 4, 2016, after further general communications between the parties concerning the dispute, and in a response to Mr. Scataglia's inquiry regarding TRUSTIVO's service initiatives, Mr. Pasovschi emailed Scataglia to inform him that TRUSTIVO was "launching the Employee Financial Health program on February 1, 2016 with several EAP partners. This program launch will go out to over 26,000 employers and 6.0 million employees." (¶40)

As a result, on January 5, 2016, Mr. Scataglia again emailed Mr. Pasovschi regarding the circumstances under which MMI would, despite its claim of a default by TRUSTIVO, continue with providing services under the Agreement through May 31, 2016, rather than March 31 as referred to in Mr. Scataglia's December 22 email. (The January 5 email is attached hereto as Ex. 7). In the January 5 email, Mr. Scataglia stated, among other things, that in order for MMI to continue providing the services it was contractually obligated to provide, TRUSTIVO would have to "pay $5 per call directed to MMI for Triage Services." (¶41

Again, despite that TRUSTIVO had contractual right to cure, and Mr. Scataglia's December 24 email had stated that MMI would give TRUSTIVO until the first week of January to cure the alleged default, Mr. Scataglia's January 5 email did not explicitly inform Mr. Pasovschi what amounts would be necessary to cure the alleged default. Instead, Mr. Scataglia explicitly stated "this payment per call is not enough funding to cure the 18.2.5 termination provision." Mr. Scataglia further stated that "if the following is agreeable to you, please reply to me 'I accept these terms' along with this email. MMI's termination notice to you remains in effect until we have written confirmation between us about how we are going to move forward." (¶42)

Later on January 5, 2016, Mr. Pasovschi—still unaware of MMI's breach of the non-compete provision in the Agreement--responded to Mr. Scataglia's request for confirmation of the agreement by stating "Tony, on behalf of TRUSTIVO, I accept the terms in your email below." (Ex. 8, (¶43)

After this and on February 1, 2016 TRUSTIVO launched its workplace financial wellness program to employers on a national scale. TRUSTIVO constructed and provided employers with a description of its services, including phone numbers for the call center (supported by MMI) where employees could call in to receive the financial wellness services promised by TRUSTIVO. Furthermore, TRUSTIVO entered into agreements with 27 (twenty-seven) employers in at least 18 states throughout the country, including a global car manufacturer with over 100,000 employees in the United States, to provide financial wellness services to their employees. (¶44)

During the ensuing several weeks, Mr. Pasovschi continued to request that MMI provide details of revenues and costs to support the alleged cost-recovery default claimed in MMI's December 21 letter, including in an email to Mr. Scataglia dated March 3, 2016 (Ex. 9, (¶45)). Nonetheless, MMI continued to fail or refuse to provide the requested in formation. Indeed, in response to Mr. Pasovschi's March 3, 2016 email requesting data, Mr. Scataglia responded that MMI couldn't provide the data, stating, "I also need to review the data from February. Note that it would be more meaningful to wait a full two months as that better allow us to better understand the outcomes of the sessions that come from the calls and that will play a major role in this program recovering its costs." (Ex. 10, ¶45)

On May 13 and May 15, 2016, Mr. Pasovschi again requested the data to support the claimed of a "cost-recovery breach." (See. Exs. 11 and 12, (¶46

On May 16, 2016, Mr. Pasovschi and Duncan Mackay, TRUSTIVO's COO, held a conference call with Mr. Scataglia, to discuss the ongoing issues relating to TRUSTIVO's alleged default. During the call Mr. Scataglia, MMI's COO stated to that the $5 per call that MMI had demanded in January "was just a starting point" and that MMI "did not have data to go by" to justify the $5 per call demand. Mr. Scataglia then claimed for the first time that MMI had incurred $15,825 in costs for 2015 for which it needed to be reimbursed--costs never claimed or disclosed during the late December 2015 and early January 2016 communications-- and an additional $1000 in costs for 2016. Mr. Scataglia also claimed that MMI needed not $5 per call, but "about $12 per call" for Triage

Services.   Further, during the call, Mr. Scataglia explicitly stated that MMI intended to terminate the Agreement even if TRUSTIVO paid the claimed costs, *i.e.,* cured the alleged default**,** and to try to negotiate a new agreement. (¶47)

On or about May 17, Mr. Pasovschi spoke again with Mr. Scataglia on the phone concerning MMI's plan to terminate the Agreement.  During the call Mr. Scataglia confirmed MMI's intention to terminate and suggested that TRUSTIVO consider entering in to a Memorandum of Understanding.   Mr. Scataglia then explained that the MOU would be a simple agreement that would not contain a non-compete provision.  Mr. Pasovschi informed Mr. Scataglia that he was not sure that he wanted to do an MOU, and preferred instead to try to cure the alleged default. (¶48)

On May 17, Mr. Scataglia emailed Mr. Pasovschi and again proposed sending Mr. Pasovschi a Memorandum of Understanding as to how the parties would proceed.  Notably, and not surprisingly given MMI's improper and extensive efforts to compete with TRUSTIVO, Mr. Scataglia stated that, in connection any MOU, MMI would not "include any detailed or extensive non-compete." (Ex. 13,  (¶49)

Later on May 17, Mr. Scataglia forwarded Mr. Pasovschi a draft of the MOU.  (The email and MOU are attached hereto as Ex. 14.) The draft MOU proposed continuing some of MMI's services in accordance with the January 5 email agreement, and terminating the original Agreement effective May 31, with "MMI wav[ing] any right of TRUSTIVO to cure any funding defaults." While the original Agreement contained a broad non-compete provision

prohibiting MMI from competing during the term of the Agreement and for one year after, the MOU proposed by MMI, conspicuously, but again not surprisingly, contained no non-compete provision. (¶50)

On May 18, 2016, Mr. Pasovschi—still unaware of MMI's improper efforts to compete with TRUSTIVO—sent an email letter to Mr. Hand, MMI's CEO, in a good faith effort to cure the alleged default. (See Ex. 15) In his letter, Mr. Pasovschi reiterated that MMI had not provided the requested data relating to the alleged cost-recovery default and expressed the belief that MMI was in breach of the cure provisions of the Agreement.  Mr. Pasovschi nonetheless proposed that, in order to resolve the dispute, TRUSTIVO pay the $12 per call for Triage Services, provided that MMI provide reasonable documentation of the Triage Service costs and the revenue associated with the Triage Service. He also proposed that TRUSTIVO make a good faith payment toward any reasonable start costs that were disclosed to TRUSTIVO before the Agreement was entered into by the parties, net of any program fees that MMI had earned under §8 of the Agreement and revenues from grants, and again, provided that MMI provided reasonable documentation of the revenues and claimed net costs.  Finally, Mr. Pasovschi proposed that the Agreement be continued through June 30, 2017 and that MMI agree to refrain from terminating the Agreement based on the "cost recovery" provisions. (¶51)

In response to Mr. Pasovschi's May 18 correspondence, Mr. Scataglia responded by email that the "MOU. . . is no longer an offer from MMI to resolve the issue." (Ex. 16,  (¶52)

On May 24, 2016-- more than five months after MMI sent its December 21, 2015 default notice--Mr. Hand responded to Mr. Pasovschi's May 18 letter, providing a highly-suspect schedule of purported costs and revenues and ostensibly setting forth the terms on which TRUSTIVO could cure the alleged default "along the lines you have proposed in your [May 18] letter to me." (See Ex. 17).  In fact, the correspondence reveals at blatant attempt by MMI to hedge its bets and refuse to unequivocally accept a cure, so as to leave it open to MMI to terminate the Agreement at any time it chooses based on claimed of *previous* cost-related defaults by TRUSTIVO. (¶53)

Specifically, in his May 24, 2016 correspondence, Mr. Hand specifically threatens to terminate the Agreement unless TRUSTIVO "compensates MMI $12 per call, which will offset ***most of*** the ongoing Triage-related expenses" (emphasis added) and "makes a direct payment to MMI of the amount of $19,145.98 to cover a ***portion of*** the expenses, net of revenues, that MMI has incurred with this program." (Emphasis added). (¶54)

Not only does Mr. Hand's reference to "most of" the Triage expenses and "portion of the expenses" implicitly leave it open to MMI to claim a later default based on the failure of TRUSTIVO to pay *all* of the expenses MMI

might later claim it had ***already*** incurred, even if never previously disclosed, but Mr. Hand's May 24, 2016 correspondence then makes this possibility explicit. He goes on to state that the invoice of purported 2015 and 2016 expenses and revenues he attaches to his correspondence "does not include our costs of counseling and senior management and executives' time related to overseeing this relationship—costs which would be significant should we choose to bill TRUSTIVO."  (¶55)

The import of this correspondence is clear and plainly evidences MMI's bad faith:  no matter what TRUSTIVO did to attempt to cure, MMI would not unequivocally accept the cure and would leave the possibility of termination dangling over TRUSTIVO. (¶56)

MMI's bad faith is, moreover, amply demonstrated by the invoice of claimed costs and revenues attached to Hand's May 24 letter.  The invoice claims the following costs and revenue for 2015 and 2016.  (¶57)

**2015 Costs**

| Time Category | Hours | Rate | Total Costs |
|---|---|---|---|
| Management | 66.45 | $ 69.77 | $ 4,636.04 |
| Training Department | 41.00 | 78.28 | 3,209.56 |
| Specialist Training | 156.20 | 38.15 | 5,958.31 |
| Program Delivery | 107.33 | 38.15 | 4,094.77 |
| Total 2015 Costs: | | | $17,898.68 |

**2016 Costs**

| Time Category | Hours | Rate | Total Costs |
|---|---|---|---|
| Management | 10 | $ 69.77 | $ 697.67 |
| Specialist Training | 6 | 38.15 | 228.87 |
| Program Delivery | 30.50 | 38.15 | 1,163.58 |
| Total 2016 Costs: | | | $2,090.12 |
| **Total Costs:** | | | **$19,988.80** |

**2016 Funding**

| | |
|---|---|
| Debt Management Plan (1) | $102.82 |
| Triage Fee ($5 per call) | 740.00 |
| **Total Funding:** | **$842.82** |
| **Total Due to Cure:** | **$19,145.98** |

The claimed expenses are in various respects incomplete and inconsistent with other information provided by MMI and are, upon information and belief, contrived at best, and, at worst, fraudulent. (¶58)

Most significantly, the MMI failed to include in the invoice any apportionment of revenue that MMI received from grants and donations, which it must do in order, to demonstrate that it has not recovered its costs. (¶59)

Further, MMI's invoice is highly suspect on its face. As alleged previously, the parties executed the Agreement on July 1, 2014 and the program began on that date. Thus, all training and other program "start-up" costs, incurred by MMI, if any, would have been in 2014, not 2015. The invoice, however, contains no costs or revenues for 2014, when most if not all of the "training" expenses would have occurred, and instead lists costs and revenues for 2015 and 2016. Furthermore, the

program was informally placed on hold in January 2015 due to perceived MMI service issues, and was on hold for the remainder of the entire 2015 year. MMI therefore could *not* have incurred these large 2015 start-up program costs during this time. (¶60)

The costs and revenues reported for 2015 and 2016 also flatly contradict information that Mr. Scataglia, MMI's COO, provided to Mr. Pasovschi in the call on May 16, 2016 and that MMI otherwise provided to TRUSTIVO.  Mr. Scataglia had claimed during the call MMI had incurred $15,825 in costs for 2015 and an additional $1,000 in costs for 2016, but the invoice claims $17,898.68 in costs for 2015 and $2,090.12 in costs for 2016.   Further, although the invoice lists  Debt Management Plan or "DMP" revenues (under §8 of the Agreement) for 2016, it does not list any such revenues for 2015, even though MMI had previously informed Mr. Pasovschi in writing that MMI had made at least one DMP from which it derived revenue in 2015. (¶61)

On June 6, 2016, Mr. Pasovschi spoke again with Mr. Scataglia by telephone. During the call, Mr. Scataglia expressed MMI's desire to enter into the MOU that MMI had previously proposed.   In response, Mr. Pasovschi reiterated that the information contained in MMI's May 24 invoice was inaccurate and incomplete, including that MMI did not apportion any grants and donations or fully disclosed all its revenues. In response, Mr. Scataglia stated that indeed some of the information provided by MMI's CEO in its May 24, 2016 invoice was incorrect, that MMI's legal department was reviewing this information.   Further, although MMI has never disputed that its determination of whether it has recovered its costs must include revenues, Mr. Scataglia stated that "it was too much trouble for MMI to go through the process of allocating grants and donations." Finally, when asked about the MMI's

Financial Wellness offering to employers (in competition with TRUSTIVO), Mr. Scataglia claimed that MMI had been providing these type of services for years—a fact, which if true, was never disclosed to TRUSTIVO before the Agreement was executed. (¶62)

In short, MMI's actions in failing or refusing to provide reasonably requested proof of the alleged cost-recovery default, and its related failure to afford TRUSTIVO a reasonable opportunity to cure the alleged default as required by §18.4 of the Agreement, and its improperly competing with TRUSTIVO during the term of the Agreement, is a breach of the Agreement. (¶63)

TRUSTIVO has suffered and will suffer catastrophic damages of an uncertain and potentially difficult to ascertain amount and irreparable harm as a result of MMI's threats and actions. (¶64)

TRUSTIVO's workplace financial wellness program rollout has been placed on hold and its contractual business obligations with over two dozen new employers are in peril. As an example of harm already done caused by MMI's actions, TRUSTIVO was forced to miss key dates and deadlines for rolling out its financial wellness services to over 100,000 employees. Moreover the relationship with a global car manufacturing company has already been irreparably harmed. This large employer had recently signed an agreement with TRUSTIVO to receive its Financial Wellness Services and was planning a program rollout to seven (7) of its locations, just as MMI threatened TRUSTIVO that it would terminate all its call center support at the end of that month. (¶65)

Furthermore, the MMI proposed June 15, 2016 phone service termination would effectively shut down TRUSTIVO's business operations as its phone centers are exclusively supported by MMI. Once TRUSTIVO's operations are shut down, its contractual obligations and reputation with existing employers, business partners, and individual customers will be irreparably harmed.  (¶66)

MMI, further, will not be substantially harmed if MMI does not terminate the Agreement on June 15, 2016 and does not stop providing the call center services. MMI already provides the "Financial Education" and counseling services to its customers, and TRUSTIVO agreed to pay, and had paid, the $5 per call that MMI requested for the Triage Services. Since MMI does not have any staff, technology or equipment dedicated to its relationship to TRUSTIVO, MMI operations are not affected or harmed in any way by continuing its services to TRUSTIVO. (¶67)

<u>Legal Discussion</u>

A.  <u>Applicable law</u>

The contract at issue provides that the "choice of law shall be Massachusetts," (Agreement at §17.15 and Massachusetts law therefore  governs this dispute.

B.  <u>Standard for issuing injunction and temporary restraining order.</u>

A party seeking a preliminary injunction must show that success is likely on the merits; irreparable harm will result from denial of the injunction; and the risk of irreparable harm to the moving party outweighs any similar risk of harm to the opposing party. See *Packaging Indus. Group, Inc. v. Cheney,* 380 Mass. 609, 616–617, 405 N.E.2d 106 (1980). The moving party must also establish that the granting of the injunction is

consistent with the public interest.  *Aspect Software Inc. v. Barnett*, 787 F.Supp.2d 118

(D. Mass., 2011).

      C.  <u>Trustivo's request to enjoin termination of the Agreement</u>

Pursuant to Prayers 4 of the  Verified Complaint, Trustivo requests that the Court

issue a restraining order ("TRO") and, after a further hearing, issue a preliminary

injunction, enjoining MMI from in any way terminating the July 1, 2014 Agreement

between TRUSTIVO LLC and Money Management International based on any claim of a

pre-existing default under §18.2.5 of the Agreement. Trustivo has a substantial likelihood

of success in showing that such termination would be in bad faith, in breach of the

agreement of explicit cure provision and the covenant of good faith and fair dealing, that

it will suffer irreparable harm if the Agreement is terminated without MMI affording it a

reasonable opportunity to cure, and that that harm outweighs any harm that MMI will

suffer if the TRO is granted.

    1.  <u>Trustivo has a substantial likelihood of success that MMI has breached the termination and cure provisions of the Agreement</u>.

By notice dated December 21, and repeatedly thereafter, MMI has threatened to

terminate the Agreement on June 15 based on the "cost-recovery" provisions of

Agreement. The Agreement at issue allows MMI to terminate the Agreement "[i]n the

event MMI is unable to fully recover its costs under this Agreement, including general

and administrative expenses."  §18.2.5 Section 18.4 of the Agreement, however,

requires MMI to give Trustivo however, fifteen (15) business days to cure the default."

In this case, MMI has failed to substantiate in any way that such a default has

occurred or afforded Trustivo a reasonable opportunity to cure.  Trustivo has repeatedly

requested that MMI provide it the data to support the claim that MMI has not been able to

recover its costs, such as information and documentation concerning the grant revenue

and donations that would offset expenses, obviously necessary for Trustivo to evaluate

whether he claimed default is made in good faith and, if so, to decide whether it can cure

      MMI has not just failed to substantiate the claimed default. It has produced

incomplete, inconsistent, and highly suspect information, and, moreover, explicitly stated

to Trustivo that MMI will not and cannot provide all of the requested data, that it will not

accept a cure, and that it intends to terminate no matter what Trustivo does:

> √     In a telephone call on May 16,  2016, MMI's Chief Operating Officer admitted to     Trustivo's CEO that at the time that MMI sent the December 21 termination notice, MMI "did not have data to go by", *i.e.,* MMI did not have the data to justify the claimed default.

> √     On May 24, 2016—five months after MMI sent its default notice— MMI's CEO Ivan Hand presented Trustivo with an invoice setting forth costs and revenue  figures claimed to be for 2015 and 2016 and purporting to substantiate the default. The invoice, however, failed to include in the invoice any apportionment of revenue that MMI received from grants and donations. It also included information that was patently inaccurate—claiming for example, expenses for 2015 that could not have been incurred, and expenses for 2015 and 2016 that contradicted information previously provided by MMI in the call on May 16.[3]

> √     The May 24 correspondence included with the invoice stated dollar figures required to continue the relationship under "a new understanding" but explicitly stated that those figures would cover only "most of" or a "portion of" its expenses, and that those figures did not include "[MMI's] costs of counseling and senior management and executives' time related to overseeing this relationship—cost which would be significant should we choose to bill TRUSTIVO."[4]

---

[3] In the call on May 16,  Mr. Scataglia had claimed during the call MMI had incurred $15,825 in costs for 2015 and an additional $1,000 in costs for 2016, but the invoice claims  costs of $17,898.68 for 2015 and $2,090.12 for 2016.  Further, while the invoice claimed significant costs for 2015, including training costs, those costs could not have been incurred in 2015, because the program started in 2014, and all training was done then (by Trustivo, not MMI), and because the program was placed on hold during virtually all of 2015 because of issues that arose between Trustivo and one of its partners.

[4] In other words, MMI was making it clear that it was unilaterally reserving the right to claim additional, not then specifically identified, costs that it might bill to Trustivo, and that, if the expenses went unpaid, could form the basis for new claimed default.

√ On June 6, Mr. Scataglia admitted to Mr. Pasovschi on the phone, that the invoice included with Mr. Hand's May 24 letter was inaccurate, contained incorrect information for 2015, and candidly stated to Mr. Pasovschi that "it was too much trouble for MMI to go through the process of allocating grants and donations."

In short, Trustivo has a substantial likelihood of showing that MMI breached its explicit obligations under the Agreement the covenant of fair dealing.

2. Trustivo will suffer immediate and irreparable harm if the TRO and preliminary injunction prohibiting MMI from terminating the Agreement <u>are not granted.</u>

Trustivo will unequivocally be irreparably harmed if the requested injunctive relief is not granted and MMI is permitted to terminate the Agreement on June 15 and cease providing the call center services. TRUSTIVO's business operations as its phone centers are exclusively supported by MMI. MMI's proposed June 15, 2016 phone service termination would therefore effectively Trustivo shut down. Once TRUSTIVO's operations are shut down, its contractual obligations, reputation and good will with existing employers, business partners will be  irreparably harmed.[5] This harm is sufficient to warrant the granting of injunctive relief. See *Kenworth of Boston, Inc. v. Paccar Financial Corp.*, 735 F.  2d.  622, 625 (1st Cir.1984)(noting that "business closure can constitute irreparable harm[.]" citing *Chinetti-Garthwaite v. Ferrari Societa per Azioni Esercizio Fabbriche Automobili e Corse*, 463 F.Supp. 73, 75 (E.D.Pa.1978).  Cf., *New England Circuit Sales, Inc. v. Randall*, Memorandum and Order dated June 4, 1996 (D. Mass 1996) (finding,  in context of employee non-compete

---

[5]  MMI's actions in improperly threatening to terminate the Agreement have already caused extensive damage to Trustivo. As a result of those threats, TRUSTIVO's national program rollout has been placed on hold and its contractual business obligations with over two dozen new employers are in peril. TRUSTIVO missed key dates and deadlines for rolling out its workplace financial wellness services to over 100,000 employees. In particular, its relationship with the global car manufacturing company has already been irreparably harmed**.**

agreement that plaintiff would suffer irreparable harm competitor,  because "it would be almost impossible to measure a plaintiff's damages if the defendant is allowed to work for a competitor."); *Shipley Co., Inc. v. Clark*, 728 F. Supp. 818, 827 (D. Mass. 1990)(finding that possibility of "unknown or future violations" of non-compete provisions sufficient to show irreparable harm because  "task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one"), quoting *Kroeger v. Stop & Shop Companies, Inc.*, 13 Mass. App. Ct. 310, 322 (1982); *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 356 F.2d. 1256, 1253-1264)(10th Cir. 2004) (observing that "irreparable harm findings are based on such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as loss of goodwill").

3.      The harm to Trustivo is outweighed by any harm to MMI if the injunctive orders prohibiting termination are granted.

    MMI will not suffer any substantial harm, let alone irreparable harm, if the TRO and preliminary injunction prohibiting termination of the Agreement is granted, and any harm it might suffer is certainly and considerably outweighed by the harm that Trustivo will suffer if the orders are not granted.

    MMI is a national company with with annual revenues exceeding $86 million. By comparison, even were the Court to accept the cost figures claimed by MMI in its May 24, 2016 invoice for 2015 and 2016 (approximately $19,000 for 2015 and $2,000 for 2016), such costs would hardly constitute a significant burden were MMI required to continue the services during the pendency of the dispute.

In any event, MMI already provides the "Financial Education" and counseling services to its customers, and TRUSTIVO agreed to pay, and has paid, the $5 per call that MMI requested for the Triage Services. Since MMI does not have any staff, technology or equipment dedicated to its relationship to TRUSTIVO, MMI operations are not affected or harmed in any way by continuing its services to TRUSTIVO.

    4.  <u>The public interest ways in favor of issuing the TRO and Injunction</u>.

Although Trustivo is not required to show that granting of the injunctive relief is consonant with the public interest, in this case it clearly is. As discussed at length previously, Trustivo is in the business of providing comprehensive workplace financial wellness services for the benefit of individuals and their families through national partnerships with employers and other business partners.  It provides some of those services to consumers through the call center operated by MMI, pursuant to the Agreement.

It is obvious that the public interest is served by the continuation of these services. The public interest therefore weighs in favor of granting the injunctive order prohibiting MMI from terminating the Agreement and the services provided to consumers under it.

    5.  The harm to Trustivo is likely to be immediate and occur before a hearing <u>can  be held on Trustivo's request for a preliminary injunction</u>.

MMI has threatened to terminate the Agreement on June 15, 2016.  Because it may not be feasible to give MMI sufficient notice of and to conduct a hearing on Trustivo's request for a preliminary injunction prior to that date, a temporary restraining order is necessary to maintain the status quo until a hearing can be held.

D.    Trustivo's request for a preliminary injunction prohibiting MMI from competing with Trustivo in violation of §16.3 of the Agreement.

Pursuant to Prayer 5 of the Verified Complaint, Trustivo has requested that the

Court enter a preliminary injunction prohibiting MMI  from:

> from in any way competing with TRUSTIVO in providing financial wellness services to any employer or organization, including without limitation, from advertising or in any way offering to employers or other organizations its Financial Solutions Program ("FSP"), as described at *http://mmifinancialsolutions.org* and page  9 of MMI's 2015   Annual Report, during the term of the July 1, 2014 Agreement or for a for a period of one year after the Agreement has expired or has been properly terminated, until further order of the Court.

1.    Trustivo has a substantial likelihood of success on its claim that MMI has breached it explicit agreement not to compete with Trustivo.

Section 16.3 of the Agreement, drafted and proposed by MMI, contains an

explicit provision prohibiting MMI from "directly or indirectly" competing with

Trustivo.  MMI has unequivocally breached that obligation.

Trustivo provides comprehensive workplace financial wellness services for the

benefit of individuals and their families. TRUSTIVO does not market its services to

individual consumers directly, however, but offers its comprehensive financial wellness

services through *employers* and business partners such as EAPs and health insurance

companies.  (See, Agreement, §12.1 and 12.2; Verified Complaint, ¶

 In contrast,  before entering into the contract, and in the contract itself, MMI

represented to TRUSTIVO that MMI's "mission" and services were consistent with its

stated "mission" and limited to providing "Financial Education" to individual consumers.

In fact, at least sometime in 2015, and possibly earlier, MMI began improperly

competing with TRUSTIVO by dramatically expanding the scope and nature of its stated mission and services and began directly and indirectly competing with TRUSTIVO by offering what MMI itself claims are **_comprehensive financial wellness services_** to **_employers_** _through its newly-developed_ Financial Solutions Program (FSP), an **_employer-sponsored_** wellness program.  Although TRUSTIVO has no way of knowing at this juncture exactly what service MMI offers to these employers, MMI is therefore directly marketing to employers the same broad category of financial wellness services that TRUSTIVO provides, and is specifically offering the  employers the Financial Education services, such as debt counseling, that it was supposed to integrate with TRUSTIVO's services under §10.4 of the Agreement.

MMI's actions in connection with the improper attempt to terminate the Agreement, further, reveal MMI's own knowledge that it is violating the non-compete provision. During that effort, MMI tried to induce TRUSTIVO to enter a new Memorandum of Understanding, and explicitly stated variously that the memo would not contain an  "extensive" non-compete provision,  or no non-compete provision at all, and then presented TRUSTIVO a proposed MOU that did not have such a provision. MMI was thus obviously trying to protect itself from claims of improper competition.

There can be little question, then, that the Court should enjoin MMI from competing with TRUSTIVO in violation of §16.3.   In Massachusetts, "a covenant not to compete is enforceable to the extent that it is "necessary to protect a legitimate business interest, reasonably limited in time and space, and consonant with the public interest." *Boulanger v. Dunkin Donuts*, 442 Mass. 635, (Mass. 2004). Legitimate business interests include the protection of confidential information and good will, (id.) ,  and extend to the

protection of existing  as well as  future customers.   Massachusetts courts will enforce a

non-compete agreement even to the extent that it extends to prospective customers.   *Cf.*

*Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 498 (1986)("it was not

unreasonable to include prospective customers within the ban").   Massachusetts courts

and the Massachusetts federal courts have therefore enforced such provisions in many

contexts, including franchise agreements  *Curry v. Steve's Franchise Co*., 1985-1 Trade

Cas. (CCH) Par: 66,421 )D. Mass. 1984), contracts involving the sale of a business, *Wells*

*v. Wells*, 9 Mass. App. Ct. 321, 325 (1980)  contracts involving the sale of land,

*Whitinsville Plaza, Inc. v. Kotseas*,  378 Mass. 85 , (1979), and employment agreements.

*All Stainless, Inc. v. Colby*, 364 Mass. 773, 779-781( 1974).

When, as here, the restraint is against a business entity and does not arise in the

employment context, further, the court will scrutinize the non-compete provision less

closely and more liberally enforce it.  *Whitinsville Plaza, Inc. v. Kotseas*,  378 Mass. 85,

102  (1979); *Wells,* 9 Mass. App. Ct. 321 (noting that concerns about unequal bargaining

power and restrictions on individual employment recede in the business context).   As

such the Supreme Judicial Court has made it clear that, while ***employers*** are "not entitled

to protection from ordinary competition," non-complete agreements in business

agreements "are not rendered unenforceable merely because they protect an interest that

we might not recognize in an employment setting."  *Whitinsville Plaza, Inc*. at 102.  See

also, *Wells*, 9 Mass. App. Ct. at 325. In such situations the Massachusetts courts, further,

will focus more on ensuring that the party benefitting from the non-compete provision

receives the "full benefit and advantages" of the contract, *id*., particularly where the

"parties entered into the agreement with the benefit of counsel and without compulsion."
*Id.*

Here, MMI, a sophisticated party with access to general counsel (see, http://www.moneymanagement.org/About-Us/Leadership.aspx) and substantial knowledge and resources, drafted and presented the non-compete provision to TRUSTIVO, and was under no compulsion to enter into it. MMI thus has has no ground to complain about its enforcement.

The non-compete provision in §16.3 of the Agreement is, further, enforceable under Massachusetts law because it enforces legitimate business interests of Trustivo, *i.e.*, the protection of confidential information and Trustivo's good will.

First, both Trustivo and MMI provide and target services on a national level, and Trustivo currently targets new employer customers on a national level.  Because MMI, through its new Financial Solutions Program  is now actually providing what MMI itself calls "comprehensive financial wellness services" (the same services provided by Trustivo) to **employers** throughout the country (the same target population as Trustivo), there is considerable risk that MMI will misappropriate, or at least diminish, Trustivo's good will.

Second, there based on its good faith belief that MMI would integrate its Financial Education Services "into Trustivo's existing suite of financial wellness services," as MMI was required to do under  §10.4 of the Agreement, rather than complete with Trustivo, Trustivo trained MMI's employees in Trustivo financial wellness services, including by providing a 20-page brochure on those services explicitly marked "proprietary and confidential."  In connection with the joint marketing efforts agreed to in

§11 of the Agreement, further, Trustivo provided confidential marketing and promotional strategies such as program features, pricing, and sales channels, to MMI. Trustivo has a legitimate interest in enforcing the non-compete provision in order to prevent MMI from improperly using that confidential information to Trustivo's disadvantage.

A preliminary injunction is therefore necessary to protect these interests.

There is an additional reason that it is particularly appropriate in this case to enforce the non-compete. MMI's not only agreed to refrain from competing with Trustivo, but as noted above, agreed to engage in a joint marketing campaign with Trustivo to market the Trustivo services provided through MMI to employers. (Agreement, §11). In this face of this obligation, to instead create and market its own competing and national "comprehensive financial wellness service" violates the spirit of §11 and covenant of good faith and fair dealing, and makes the breach of the non-compete provision particularly egregious.

2.  The non-compete provision is reasonable in geographic scope and time.

The non-compete provision in §16.3, while not specifically limited to any particular geographic area, is none the less reasonable. Both Trustivo and MMI engage in business nationally, and the agreement, even if construed to be national in scope, is thus still aimed at protecting Trustivo's good will. See, *Marine Contractors Co., Inc. v. Hurley*, 365 Mass. 280 (Mass., 1974)( "The geographical scope of the agreement coincides with the area in which Marine performs almost all of its work, and thus is precisely drawn to protect Marine's good will.") (Citations omitted.)

The non-compete provision is also reasonably limited in time.  The Agreement provides for one year terms that automatically renew annually unless terminated, and non-compete is in effect while the Agreement is effect and for one year after termination. Such a period is manifestly reasonable, inasmuch as Massachusetts court have frequently enforced non-compete provisions, even the employment context, for even longer periods. See, *Blackwell v. E. M. Helides, Jr. Inc*., 368 Mass. 225, 229 (1974)(three years); *All Stainless, Inc. v. Colby*, 364 Mass. 779 (1974)(two years); *Frank D. Wayne Associates v. Lussier*, 16 Mass. App. Ct. 986, 989 (1983)(two years).[6]

3.  <u>Trustivo will suffer irreparable harm if MMI is not enjoined from competing</u>.

If MMI is permitted to continue competing, despite its explicit agreement to refrain from doing so and its having obtained confidential information, Trustivo will be irreparably harmed. To begin, there is a considerable likelihood that MMI will use the confidential information concerning Trustivo's financial wellness services to Trustivo's disadvantage in marketing its own "comprehensive financial wellness services" to Trustivo's target population, *i.e.*, employers. That likelihood clearly constitutes irreparable harm.

Second, in the event that MMI is not enjoined from competing, Trustivo will suffer damages that, though likely catastrophic, will be difficult if not possible to calculate.  That likelihood is sufficient to constitute irreparable harm. *See. New England Circuit Sales, Inc. v. Randall*, Memorandum and Order dated June 4, 1996 (D. Mass 1996) (finding,  in context of employee non-compete agreement that plaintiff would suffer irreparable harm competitor,  because "it would be almost impossible to measure a

---

[6] MMI is, moreover, hardly in a position to argue that the geographic scope and duration of the non-compete provision are unreasonable.  MMI is a sophisticated party likely represented by its general counsel in connection with the Agreement, and MMI drafted the non-compete provision.

plaintiff's damages if the defendant is allowed to work for a competitor."); *Shipley Co., Inc. v. Clark*, 728 F. Supp. 818, 827 (D. Mass. 1990)(finding that possibility of "unknown or future violations" of non-compete provisions sufficient to show irreparable harm because "task of quantifying the consequences of violating a non-competition clause is a particularly difficult and elusive one"), quoting *Kroeger v. Stop & Shop Companies, Inc.*, 13 Mass. App. Ct. 310, 322 (1982).

Indeed, as stated by Judge Tauro in *Shipley Co., Inc. v. Clark*, 728 F. Supp. 818, 827 (D. Mass. 1990) in enjoining competition by the defendants, "it would be difficult, if not impossible, to determine which of the other clients defendants may generate would have otherwise gone to [the plaintiff] for business." Trustivo is in precisely the same position because it may not ever be able to prove precisely which employer customers that MMI enters into agreements with might have otherwise gone to Trustivo.

   4.   The irreparable harm to Trustivo outweighs any harm to MMI.

The irreparable harm Trustivo will suffer considerably outweighs any harm that MMI will suffer it if it is enjoined from competing with Trustivo through its Financial Solutions Program. Again, MMI had over $86 million in revenue in 2012, before it apparently implemented the Financial Solutions Program. MMI is a vastly larger company than TRUSTIVO, and can obviously absorb any impact of the injunction. Further, even if MMI could show substantial hardship, the hardship should have been anticipated, and is not ground for MMI to complain. See, *Marine Contractors, Inc. v. Hurley*, 365 Mass. 280, 289 (1974)(noting that while defendant might suffer substantial hardship, "there is no evidence of any subsequent change in circumstances which might cause him ***unanticipated*** hardship")(Emphasis added.).

5. The public interest favors issuance of the injunction prohibiting MMI from competing.

MMI, again, a sophisticated party, drafted and freely entered into the non-compete provision.  There is a public interest in enforcing holding MMI to its promises.  *Avaya, Inc. v. Ali*, Memorandum and Order, July 13, 2012, C.A. No. 12-10660-DJC (D. Mass. 2012)(noting public interest in "ensuring that legally enforceable contracts are in fact enforced");  *Aspect Software Inc. v. Barnett*, 787 F.Supp.2d 118 (D. Mass., 2011)(noting Massachusetts interest in ensuring that Massachusetts contracts are enforced). That interest militates in favor of granting the preliminary injunction.

**TRUSTIVO LLC,**
*BY ITS COUNSEL,*


*/s/ Timothy M. Hughes*
Timothy M. Hughes, BBO#548708
Attorney at Law
6 Old County Road, Suite 9
Sudbury, MA 01776
978-443-4460
hugheslaw1@verizon.net

DATED: June 14, 2016

CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of June, 2016,  I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Pamela E. Berman, Esq.
Bowditch & Dewey, LLP
One International Place
44th Floor
Boston, MA 02110


*/s/ Timothy M. Hughes*
Timothy M. Hughes